IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SOPHIA M. & TEANNA M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SOPHIA M. AND TEANNA M.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TRAVIS M., APPELLANT.

Filed July 9, 2019.    No. A-18-947.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER E. KELLY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Mary Rose Donahue for appellant.

Donald W. Kleine, Douglas County Attorney, and Emily Peklo for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Travis M. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his children, Sophia M. and Teanna M. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Travis is the biological father of Sophia (born 2013) and Teanna (born 2014). Sandra P. is the children's biological mother. A motion for termination of Sandra's parental rights to the children was filed in these juvenile proceedings, but she ultimately relinquished her parental rights to the children. Because Sandra is not part of this appeal, she will only be discussed as necessary.

- 1 -

In July 2017, the children were removed from Sandra's parental care and custody because of her drug use; Travis was residing in the Lancaster County Department of Corrections at the time and was unable to provide care for the children. Sophia and Teanna were placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and into foster care where they have remained; they have been in a relative foster home (paternal aunt) since November 2017.

On July 14, 2017, the State filed a supplemental petition alleging that Sophia and Teanna were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), due to the faults or habits of Travis. The State alleged that: Travis was currently incarcerated; Travis had failed to provide proper parental care, support, supervision and/or protection for the children; Travis had failed to provide safe, stable and/or appropriate housing for the children; and for the reasons stated above, the children were at risk for harm.

On August 10, 2017, the State filed an "Amended Supplemental Petition and Termination of Parental Rights." The State once again alleged that Sophia and Teanna were children within the meaning of § 43-247(3)(a) due to the faults or habits of Travis. Additionally, the State sought to terminate Travis' parental rights to the children pursuant to Neb. Rev. Stat. § 43-292 (Reissue 2016), specifically subsection (1), abandonment for 6 months or more; subsection (2), substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection; and subsection (9), aggravated circumstances.

On August 25, 2017, the juvenile court ordered that Travis be allowed reasonable rights of agency-supervised visitation, at a neutral location, as arranged by DHHS and/or Nebraska Family Collaborative (NFC). Travis was also ordered to notify the court, all counsel in the matter, and DHHS/NFC of any change of address and phone number within 48 hours of the change.

On October 18, 2017, an adjudication hearing was held on the amended supplemental petition and termination of parental rights. The order filed the following day states that Travis admitted the count in the amended supplemental petition alleging that the children were within the meaning of § 43-247(3)(a) because he had failed to provide proper parental care, support and/or protection to the children; the remainder of the counts were dismissed on the oral motion of the State. Accordingly, the children were adjudicated to be within the meaning of § 43-247(3)(a) based on Travis' admission to the allegation noted. The order states the matter proceeded to immediate disposition. The juvenile court ordered that Travis: cooperate with family support services; undergo a psychological evaluation and parenting assessment; participate in and successfully complete a parenting course; submit to random drug and alcohol testing, in any form designated by DHHS/NFC, immediately upon request; and be allowed reasonable rights of agency-supervised visitation.

In its order filed on December 20, 2017, following a disposition evaluation and permanency planning hearing, the juvenile court's orders for Travis remained the same as set forth in its October 18 disposition order outlined above, except the provision for supervised visitation no longer read "agency-supervised." Additionally, Travis was ordered to: obtain and maintain safe, appropriate, and adequate housing for himself and his children; and maintain a stable and legal source of income.

In its order filed on February 28, 2018, following a dispositional evaluation check hearing, the juvenile court's orders for Travis remained the same as set forth in its December 20, 2017, order outlined above, except the provision for Travis to undergo a psychological evaluation and

parenting assessment was not included in the February 28, 2018, order. Additionally, Travis was ordered to: participate in and successfully complete dual-diagnosis outpatient therapy; and participate in medication management as recommended by his therapist.

On June 11, 2018, the State filed a second motion for termination of parental rights seeking to terminate Travis' parental rights to the children pursuant to § 43-292(2) and (6). The State alleged that: Travis substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); and termination was in the children's best interests.

In its order filed on June 27, 2018, following a review and permanency planning hearing, the juvenile court's orders for Travis remained the same as set forth in its February 28 order outlined above, except the provisions for medication management and drug and alcohol testing were not included in the June 27 order.

TERMINATION HEARING

The hearing on the second motion to terminate Travis' parental rights was held on September 5, 2018. The State called several witnesses to testify, and Travis testified on his own behalf. Numerous exhibits were also received into evidence. A summary of the relevant evidence follows.

Among the exhibits received into evidence were certified copies of two previous juvenile court cases involving this family, one filed in 2013 and the other in 2015. In the case filed in 2013 (exhibit 18), Sophia (5 months old) was removed from the parental home in November due to concerns of domestic violence and drug use, and a juvenile petition was filed. Although Travis admitted that his use of alcohol and/or controlled substances placed Sophia at risk for harm, and that he failed to provide proper parental care, support and/or supervision for her, it does not appear that Sophia was actually adjudicated to be a child within the meaning of § 43-247(3)(a). Rather, by agreement of the parties, the juvenile court took its findings under advisement so that the parents could voluntarily participate in services and obtain a custody order in district court. In March 2014, Sophia was placed with Travis and the juvenile case was dismissed in June. However, only 6½ months later, the next juvenile case was filed in January 2015.

In the case filed in 2015 (exhibit 19), Sophia (19 months old) and Teanna (5 months old) were removed from the parental home in January due to concerns of drug use and lack of proper care, and a juvenile petition was filed. In April, the children were adjudicated under § 43-247(3)(a), based in part on Travis' admission that his use of alcohol and/or controlled substances placed the children at risk for harm. The children remained in an out-of-home placement until June 2016 when they were placed with their mother; DHHS was relieved of custody and responsibility in November, and the juvenile court terminated its jurisdiction over the case in December. During the course of that juvenile case, Travis went from having supervised visits, to unsupervised visits, and back to supervised visits again; his visitation remained supervised at the last review hearing before the court terminated its jurisdiction over the case. However, 6½ months after the juvenile court terminated its jurisdiction in that case, the current juvenile case was filed in July 2017.

Jennifer Sageser is a family permanency specialist (FPS) with PromiseShip, formerly known as NFC. Sageser testified that she was the caseworker for this family from August 2017 to

February 2018; she had also been one of the caseworkers for the family during the previous 2015 juvenile case. During her time on the current case, Sageser met with Travis every month. She authored exhibit 4, the court report and case plan prepared on December 4, 2017. According to that exhibit, Travis was incarcerated in August 2016 and in August 2017 had been "recently released." He had attended "100%" of his visits; he had been visiting Sophia and Teanna once a week and the girls appeared bonded to Travis and did not want to leave visits. The court report stated that Travis completed four out of seven drug tests, and tested negative on each completed test. Sageser testified that during the period covered by the December 2017 court report, Travis was employed with a company that put gutters on houses and buildings, and she was aware that he was sometimes required to travel out of town for work. Travis did not always convey to Sageser the times he would be out of town and possibly miss UAs or family support services; when he did not communicate with her, she could not make the different agencies aware of his schedule. His communication regarding out-of-town travel improved, and they were able to make arrangements with the different agencies. Sageser agreed that if a parent goes out of town for their employment, that they are still responsible for fulfilling the court orders. Sageser did not personally see any interaction between Travis and the children. She eventually transferred the case to Kahlil Ryan in February 2018.

Ryan has been an FPS with PromiseShip since January 2018, and had previously been an intern there since August 2017. This case was one of Ryan's first as an FPS. When Ryan took over this case from Sageser in February 2018, they had a "transfer staffing" with their supervisor. Ryan also reviewed the documentation in N-Focus, the "database where we keep all of our case files and documentation for information about children, placement, and their families." Ryan looked through the previous court report, and through all of the past court orders. Based on a review of the case, Ryan's understanding was that Sophia and Teanna entered foster care in July 2017 due to their mother's drug use; because Travis was incarcerated, he was unable to provide care. The children have remained wards of the State since July and have not returned to Travis' home.

Ryan acknowledged that part of an FPS' job duties and responsibilities is to be aware of whether or not a family has prior juvenile court or DHHS involvement; a child's placement history and previous court cases can be found in N-Focus. Ryan testified, "[i]t's important to know what they've previously been involved with because those circumstances may still be present, speaking to drug use or domestic violence." "It is also important because it indicates a level of risk, and we also should know what services the parent has already participated in and what those services have impacted in their ability to parent safely." In reviewing N-Focus, Ryan found there was a previous case filed in October 2013 and closed in March 2014; the case involved both parents and concluded with Travis taking placement of Sophia. There was also a case in January 2015 that was closed in June 2016; this case also involved both parents and closed with the girls being placed with their mother (Travis "was not closed successfully as placement").

When Ryan was assigned to this case in February 2018, the court orders were in the process of changing. "The original court orders included a psychological evaluation with a parenting assessment, family support work, random and frequent . . . drug tests. It also included for Travis to maintain safe and stable housing [and] a legal source of income[,] and have reasonable rights to supervised visitation." In February, "the court orders were changed as Travis had completed the

psychological evaluation, and that court order was dropped, and included was dual diagnosis outpatient treatment and medication management," "[t]he other court orders still applied."

Ryan authored exhibit 12, the court report and case plan prepared on June 19, 2018. According to that exhibit, Travis had visits scheduled once per week, "which is his preferred frequency." "Travis is allotted more time for visits than one day per week," but "Travis chose to only have visits one day per week, and is not consistent with attending even these infrequent visits." The visits occur in a neutral location "as Travis has not been able to present an appropriate home environment for visits." In December 2017, Travis attended three out of five visits (cancelled two for work); in January 2018, he attended all four visits; in February he attended two out of four visits (one cancelled for work, one for weather); in March he attended two out of four visits (cancelled two for work); in April he attended four out of five visits (cancelled one for work); in May he attended three out of five visits (the worker needed to reschedule one of the visits but Travis did not respond and Travis cancelled the other visit due to car trouble). The report indicates the girls respond well to Travis and are sad when visits are over.

As for other court-ordered services, the report states that Travis attended one session of dual-diagnosis outpatient treatment in March 2018, and then did not return. Travis was referred for medication management services, but he did not attend the evaluation. He was participating in family support through Owen's and Associates in November 2017, attended sessions for one month, and was unsuccessfully discharged in December for lack of engagement; this ended his parenting course as well. In February 2018, Ryan gave Travis a list of agencies where he could complete a parenting class, but he did not begin a parenting course at any of the agencies. Travis was re-referred for family support in March 2018, but was unsuccessfully discharged in May for a lack of engagement. Travis was discharged from Owen and Associates for drug testing in February 2018 due to lack of participation. He would not comply with a hair follicle test which was referred in January. He reported relapsing on methamphetamines in both January and March, and he reported frequently using marijuana and alcohol. Travis had housing suitable for visits, but not for the children to reside because of a roommate's background check. The report stated that Travis is not participating in any court-ordered services aside from parenting time, and he is inconsistent with parenting time.

Ryan testified regarding Travis' progress and compliance with court orders. Ryan was concerned about Travis' drug use. Travis had not completed a hair follicle drug test, which was referred in January 2018. Travis told Ryan that he would not let anybody but his barber touch his hair; arrangements were made so that he and his barber could go to the testing site at no cost to Travis, but the test still was not completed. Travis admitted relapsing on methamphetamines in January and March, but he was not willing to comply with substance abuse treatment at that time. In February, Ryan had spoken with Travis about "outpatient substance abuse treatment, dual diagnosis treatment," and Travis stated he would be participating in a program; he quit participating after one session.

In March 2018, Travis told Ryan that "just because he doesn't follow the Court orders on a piece of paper doesn't mean that he won't get his kids back." Travis also told Ryan "that he may be participating in services, but he would not be providing [Ryan] a release and he would just talk to the Judge." At that time, Ryan "was telling Travis of the importance of his participating and the risks we were facing with him, potentially, losing his rights to his children, and he displayed that

he was not compliant with services and was not going to comply with his case plan or court orders to increase safety."

Ryan was concerned that Travis was only attending approximately 73 percent of his visits from December 2017 to May 2018; "It is alarming that he was only able to attend 73 percent of visits offered only once per week, which indicates that he would not be consistent in a more full-time parenting setting." And Travis' visits had never been anything other than supervised. In March, Travis notified Ryan that he moved from Lincoln, Nebraska, to Omaha, Nebraska (the children lived in Omaha). In June, Travis became more consistent with visits and requested an increase in the amount of visits offered; increased visits were authorized. Travis was not employed at the time Ryan took over the case in February, but provided proof of employment in July, after the second motion to terminate his parental rights was filed in June. Also after the filing of the motion to terminate his parental rights, Travis completed a parenting class in late August. It was concerning to Ryan that "we are 14 months in, and a parenting class has just been completed," it "speaks to Travis' willingness to comply with his court orders and his willingness to become a safer parent."

When Ryan did a walkthrough of Travis' home in May 2018, it was not found to be appropriate; there were smoke detectors missing in the basement and Ryan was able to "identify the scent of marijuana." Travis told Ryan that he did not smoke marijuana, that it was the other people who resided in the home. Later, Travis told Ryan that the other people in his home did not want to be involved and would not sign a release of information for background checks; the children cannot be placed in the home if background checks are not completed on all persons living there.

Ryan testified that Travis "has not been participating consistently in improving safety up to this point." And based "on the lack of progress that has been made in this case," it would be in the children's best interest to terminate Travis' parental rights.

On cross-examination, Ryan acknowledged that between June and September 2018, Travis had made some progress in complying with court orders. At the time of the termination hearing in September, Travis was currently participating in family support services (since the beginning of August), outpatient treatment (started in August), drug testing (he had "clean" drug tests in August except for one positive test for Tylenol with codeine, but he had a prescription), and supervised visits (agency-supervised 2 days per week, and supervised by relative foster parent 5 days per week; Ryan became aware of the foster home visits in late July). Travis had also completed a parenting course. The fact that Travis had made some progress on the court orders since June (when the second motion for termination of parental rights was filed) did not affect Ryan's opinion regarding termination of parental rights.

Melisa Stolley is a supervisor with Owens & Associates. Stolley testified that Owens & Associates provided drug testing services to Travis beginning in October 2017 until around February 8, 2018, at which time he was discharged for lack of participation. Exhibit 25 reveals that from October 31, 2017, to February 8, 2018, there were 7 successful attempts to drug test Travis (he tested negative each time), but there were 22 unsuccessful attempts to drug test him.

Stolley also testified that Owens & Associates provided family support services to Travis from November 2 to December 20, 2017, at which time he was discharged for lack of participation. The goals for family support were a nurturing parenting program, community resources, and

budgeting. Travis was already "pretty knowledgeable" about the community resources available to him, and he completed the budgeting goal. But Travis had only made it to "maybe" chapter 7 (out of 30) of the parenting course book before he was discharged from family support services.

Joaquin Guerrero is a family support worker with Owens & Associates. He does supervised visitation and also does family support work with his families. Guerrero testified he worked with Travis "briefly in April [2018]." They were supposed to work on four goals: finding housing, parenting classes, implementing the parenting classes at visits or during family support sessions, and accessing community resources. Guerrero first met Travis on April 3, 2018, and they worked on family support for 2 hours. After that session, they were to meet every Tuesday from 5 to 7 p.m., at the same location. However, the following week, April 10, Travis was a "no-show"; Guerrero "called and left some voicemails" for Travis. The meetings on April 17 and 24 were considered "cancelled" because Guerrero could not reach Travis; Guerrero tried calling Travis, but Travis' phone "was either not working or something was wrong with the phone." On cross-examination, Guerrero acknowledged that he himself was also not available on April 17 and 24. When asked if that was why the sessions were cancelled, Guerrero responded: "It was a combination of I couldn't reach him and my supervisor went ahead because . . . I made efforts, and the phone wasn't working. She went ahead and said, instead of going there and sitting for another no-show, she assigned me to cover another case." Guerrero acknowledged that he did not go the meeting place on April 17 or 24, so he did not know whether Travis actually went on those days. On redirect, Guerrero explained that because Travis was a no-show on April 10, Guerrero tried to call and confirm the April 17 meeting a couple days ahead of time, but could not reach Travis. On May 1, Guerrero spoke with Travis on the phone; Guerrero acknowledged that during that conversation Travis expressed a desire to continue with family support services. However, after that, Guerrero's supervisor discharged Travis for "lack of participation."

Travis testified that he currently participated in visitation with his children and sees them "[p]robably about seven" days per week; he started this frequency of visitation "like a month before" the second motion for termination of parental rights was filed. When he visits, he works with Sophia on spelling her name, and works with Teanna on colors and shapes. He will "put them to bed on Friday night, . . . leave, [and] come back early in the morning . . . before they wake up and feed them breakfast and lunch and dinner." Travis stated he had a "very strong bond" with Sophia, and also has a strong bond with Teanna.

JUVENILE COURT'S DECISION

In an order filed on September 7, 2018, the juvenile court terminated Travis' parental rights to Sophia and Teanna after finding that statutory grounds for termination existed pursuant to § 43-292(2) and (6), and that termination of his parental rights was in children's best interests. The juvenile court ordered that Travis may have two agency-supervised visits per month pending resolution of any appeal.

Travis appeals the juvenile court's order.

ASSIGNMENTS OF ERROR

Travis assigns, restated, that the juvenile court erred in finding that (1) statutory grounds exist to terminate his parental rights and (2) termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Travis' parental rights to Sophia and Teanna, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect) and § 43-292(6) (having determined children were juveniles as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct conditions leading to determination).

Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). "Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. 953, 961, 870 N.W.2d 141, 148 (2015). And "[o]ne need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2)." *In re Interest of Joseph S. et al.*, 291 Neb. at 962-63, 782 N.W.2d at 149. "A parent may as surely neglect a child of whom she [or he] does not have possession by failing to put herself [or himself] in a position to acquire possession as by not properly caring for a child of whom she [or he] does have possession." *In re Interest of J.N.V.*, 224 Neb. 108, 112, 395 N.W.2d 758, 761 (1986).

This is the third time this family has had a juvenile court case involving the removal of the child(ren) from the home. In 2013, Sophia (5 months old at the time) was removed from the home. In that case, Travis admitted that his use of alcohol and/or controlled substances placed Sophia at risk for harm, and that he failed to provide proper parental care, support and/or supervision for her. The juvenile court did not adjudicate Sophia to be a child within the meaning of § 43-247(3)(a), but instead allowed the parents to voluntarily participate in services. Travis obtained placement of Sophia in March 2014, and the juvenile case was dismissed in June. However, only 6½ months later, the next juvenile case was filed in January 2015.

In the case filed in 2015, Sophia and Teanna (19 months old and 5 months old, respectively) were removed from the home. They were adjudicated under § 43-247(3)(a), in part based on

Travis' admission that his use of alcohol and/or controlled substances placed the children at risk for harm. The children remained in an out-of-home placement until June 2016 when they were placed with their mother; the juvenile court terminated its jurisdiction over the case in December. (According to Ryan's review of the case file, Travis "was not closed successfully as placement.") Once again, 6½ months after the juvenile court terminated its jurisdiction in that case, the current juvenile case was filed in July 2017.

When this juvenile case was filed in July 2017, Travis was incarcerated and therefore was unable to provide care for his children. Sophia and Teanna were adjudicated under § 43-247(3)(a) based on Travis' admission that he had failed to provide proper parental care, support and/or protection to the children. The court report and case plan prepared on December 4, 2017, notes that Travis was incarcerated in August 2016, and in August 2017 had been "recently released." The record reflects from the time of his release until December, Travis attended all of his scheduled visits, which occurred once per week. However, from December 2017 to May 2018, he attended only 73 percent of his weekly supervised visits; and he chose not to have visits more than once per week. He was also discharged from family support and drug testing services for lack of participation. By refusing to participate and make consistent progress in services, Travis failed to put himself in a position to acquire possession of the children. See *In re Interest of J.N.V., supra*. Our de novo review of the record clearly and convincingly shows that grounds for termination of Travis' parental rights under § 43-292(2) were proven by sufficient evidence.

We need not consider whether termination of Travis' parental rights was proper pursuant to § 43-292(6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination is in the children's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nichole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nichole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Travis cites to *In re Interest of Joseph S. et al*, 291 Neb. at 963, 870 N.W.2d at 149, for the proposition that "the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." While it is true that perfection is not required, we cannot ignore that this is the third time this family has had a juvenile court case involving the removal of the child(ren) from the home. Despite this fact, after Sophia and Teanna were removed from their mother's care in July 2017 (and after Travis' release from incarceration in approximately August), Travis made little progress in complying with court orders until after the second motion to terminate his parental rights was filed in June 2018. It was only then that he became more consistent with visits and requested an increase in the amount of visits offered. And it was not until after the second motion to terminate his parental rights was filed that Travis once again began participating in family support services and drug testing (having been previously discharged for lack of participation). We acknowledge that Travis also completed a parenting course and began outpatient treatment. But "[l]ast-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights." *In re Interest of Alec S.*, 294 Neb. 784, 796, 884 N.W.2d 701, 709 (2016).

In his brief, Travis argues that "the State made no showing of how a termination of his parental rights would be in the best interests of his daughters." Brief for appellant at 15. He cites to *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), wherein the Nebraska Supreme Court reversed a termination of parental rights where the State did not call the child's therapists, foster parents, teachers, or support workers who directly observed the mother and child together as witnesses in a termination hearing; the State called only one witness who served as a proxy for all of the others witnesses whose testimony would have been helpful. However, *In re Interest of Aaron D.* was later distinguished by *In re Interest of Alec S., supra*, which noted that in *In re Interest of Aaron D.*, termination was sought solely on § 43-292(7); the record did not contain any dispositional orders setting forth the court-ordered rehabilitation plans and the State relied on the mother's alleged failure to comply with requirements that were not fully evidenced by the record; and only one witness was called as a proxy for all for all other witnesses. In *In re Interest of Alec S.*, the Nebraska Supreme Court stated:

> Certainly, the State could have called more witnesses and produced more evidence. In *In re Interest of Aaron D.*, like in this case, no testimony was adduced from the child's foster parents, teachers, or visitation supervisors. The Court of Appeals noted several deficiencies in the record: It contained no evidence from [Dr.] Patera as to [the mother's] need for inpatient treatment, no evidence "as to how [the mother's] mental health diagnoses and treatment needs affected her ability to safely parent Alec," little evidence "regarding what is continually and vaguely referred to as [the mother's] 'mental health needs' upon which the removal and adjudication were primarily based," and no evidence as to why [the mother] was required to undergo random testing for alcohol or drugs. However, the record contains [the mother's] mental health diagnoses and refers to issues she had with alcohol and controlled substances. While filling in these gaps could have aided appellate review, the lack of all the "gory details" does not mean the State failed to meet its burden of proof.

294 Neb. at 795, 884 N.W.2d at 708.

At the time of the hearing, Sophia and Teanna had been in an out-of-home placement for nearly 14 months. During the pendency of this case, Travis made little progress until shortly before the termination hearing. Travis had not even progressed to being allowed unsupervised visitation with his children. Given that he had only recently begun participating in court-ordered services again, it appears that much progress must still be made before reunification could occur. In the meantime, Sophia and Teanna would be left to languish in foster care for an unknown amount of time with no guarantee of reunification (especially given Travis' history of noncompliance and relapses). Travis testified that he had a strong bond with Sophia and Teanna. But having a bond with a child does not make a parent a fit person to provide parental care for him or her. See *In re Interest of Alec S., supra*. And although no witnesses testified about the children's need for permanency, we find that the children certainly deserve permanency and a safe and stable home. Travis' failure to comply with the court-ordered rehabilitation plan has served as a barrier to reunification. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Travis. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Travis' parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Travis' parental rights to Sophia and Teanna.

AFFIRMED.